# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

FRANCISCAN ALLIANCE, INC., *et al.*,

        *Plaintiffs*,

    v.

NORRIS COCHRAN, Acting Secretary of the
United States Department of Health and
Human Services, *et al.*,

        *Defendants*.

No. 17-10135

## PROPOSED INTERVENORS' OPPOSED MOTION FOR STAY OF PRELIMINARY INJUNCTION

## INTRODUCTION

On December 31, 2016, the district court issued a nationwide preliminary injunction restraining Defendants from enforcing a federal regulation (the "Final Rule") implementing Section 1557 of the Affordable Care Act to prohibit discrimination based on gender identity and termination of pregnancy. By barring Defendants from enforcing the Final Rule to protect transgender people and women seeking reproductive care against discrimination, the nationwide preliminary injunction puts these vulnerable populations at risk of being denied essential healthcare of any kind simply because of who they are. Indeed, the injunction is already being invoked to deny access to essential healthcare. A stay is necessary to prevent further acts of discrimination. Proposed Intervenors have established a likelihood of success on the merits, or at the very least a serious legal question, regarding the propriety of the nationwide preliminary injunction. And a temporary stay of the injunction will not irreparably harm Plaintiffs.

Moreover, the preliminary injunction goes far beyond the harms identified by Plaintiffs, who object to provide transition-related care and certain forms of reproductive care. It enjoins Defendants from taking any action to enforce Section 1557 against a covered healthcare entity that refuses to provide care of *any* kind of care for—or even harasses—a transgender person because they do not conform to traditional sex stereotypes. For example, Defendants are enjoined from even taking action against an entity that refuses to provide routine healthcare to a patient because the person is transgender. Defendants are also enjoined from taking any action to enforce Section 1557 against a covered healthcare entity that refuses to provide care for a woman

because she has previously obtained an abortion. At the very least, then, a stay is warranted to limit the preliminary injunction's scope to the particular harms alleged by Plaintiffs.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

Section 1557 of the Affordable Care Act prohibits discrimination in federally financed healthcare programs and activities on the basis of race, sex, color, national origin, age, or disability. 42 U.S.C. § 18116. On May 18, 2016, the Department of Health and Human Service ("HHS") published the Final Rule, "Nondiscrimination in Health Programs and Activities," implementing Section 1557. 81 Fed. Reg. 31,376. The Final Rule states in relevant part that Section 1557's prohibition against sex discrimination includes "discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity." *Id.* at 31,467; 45 C.F.R. § 92.4. The Final Rule further provides that entities receiving federal funding "may no longer deny or limit services based on an individual's sex, without a legitimate nondiscriminatory reason." 81 Fed. Reg. at 31,455. The Final Rule applies only to covered entities; it does not require individual doctors at covered entities to perform any particular procedure. 81 Fed. Reg. at 31,384. The Final Rule also provides that "[s]cientific or medical reasons can justify distinctions based on" sex. 81 Fed. Reg. at 31,405.

On August 23, 2016, Plaintiffs brought this lawsuit against Secretary Burwell and the U.S. Department of Health and Human Services ("Defendants") challenging the Final Rule on a number of constitutional and statutory grounds. Dkt. No. 1. There are two groups of Plaintiffs.

---

[1] The district court denied Proposed Intervenors' motion for a stay on January 24, 2016. Plaintiffs have stated they intend to oppose this motion; Defendants take no position. Per 5th Cir. R. 27.4, Proposed Intervenors request that the parties be directed to file their responses by February 24, 2017; that Proposed Intervenors reply by March 3, 2017; and that this Court rule by March 17, 2017.

The first group ("Private Plaintiffs") includes: Franciscan Alliance, Inc., a Roman Catholic hospital system; Specialty Physicians of Illinois, LLC, a member managed limited liability company of which Franciscan is the sole member; and the Christian Medical & Dental Associations ("CMDA"), an Illinois nonprofit corporation that provides a variety of professional programs and services for its members. The second group ("State Plaintiffs") comprises the State of Texas, the State of Wisconsin, the State of Nebraska, Governor Matthew G. Bevin on behalf of the Commonwealth of Kentucky, the State of Kansas, the State of Arizona, the State of Louisiana, and Governor Phil Bryant on behalf of the State of Mississippi.

Proposed Intervenors—whose members include transgender people and women seeking reproductive healthcare—moved to intervene in the lawsuit on September 16, before any motions or responsive pleadings were filed. Dkt. No. 7. On Plaintiffs' motion, and over Proposed Intervenors' opposition, the district court extended the parties' time to respond to the intervention motion until 14 days after Defendants file their responsive pleading. Dkt. No. 20. Shortly thereafter, Plaintiffs filed motions for partial summary judgment or, in the alternative, preliminary injunction. Dkt. Nos. 22, 24. Proposed Intervenors asked the district court to stay briefing and reset briefing deadlines on the motion to intervene, so that Proposed Intervenors could have an opportunity to participate as parties in preliminary injunction proceedings in the event intervention was granted. Dkt. No. 27. The district court denied the motion. Dkt. No. 32 at 6. On November 10, Proposed Intervenors filed a motion for reconsideration or stay of proceedings. Dkt. No. 38. The district court did not rule on the motion.

On December 31, the district court issued a nationwide preliminary injunction against the Final Rule's provisions prohibiting discrimination based on gender identity and termination of pregnancy. Dkt. No. 62. On January 9, 2017, Proposed Intervenors filed a combined motion for

ruling on intervention and stay of the preliminary injunction pending appeal. Dkt. No. 63. On

January 24, the district court issued an order denying intervention as of right, denying Proposed

Intervenors' request for a stay, and ordering further briefing on permissive intervention. Dkt. No.

69. On January 30, Proposed Intervenors filed a protective notice of appeal from the district

court's preliminary injunction on order. Dkt. No. 71. On February 2, Proposed Intervenors

appealed the denial of intervention as of right. Dkt. No. 72.

## ARGUMENT

This Court considers four factors in deciding whether to stay an injunction pending

appeal: (1) whether the movant is likely to succeed on the merits; (2) whether the movant would

likely suffer irreparable injury from the denial of a stay; (3) whether the other parties will not be

substantially harmed by the grant of a stay; and (4) whether a stay is in the public interest. *See,*

*e.g.*, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410

(5th Cir. 2013). A movant "need only present a substantial case on the merits when a serious

legal question is involved" and "the balance of equities weighs heavily in favor of [a] stay."

*United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 39 (5th Cir. 1983). Under either standard, a

stay of proceedings is justified here.

I.    **Proposed Intervenors Have Demonstrated a Likelihood of Success on the Merits, or
      at the Very Least a Serious Legal Question, as to the Propriety of the Preliminary
      Injunction.**

The district court granted the nationwide preliminary injunction against the Final Rule on

two grounds: (1) it concluded that Plaintiffs are likely to succeed on their Administrative

Procedure Act ("APA") claims that the Final Rule unreasonably construed Section 1557's

prohibition against discrimination on the basis of sex; (2) it concluded that Private Plaintiffs are

likely to succeed in demonstrating that the Final Rule violates their rights under the Religious

Freedom Restoration Act ("RFRA"). On both points, the district court's analysis was seriously

flawed. First, the district court's interpretation of Section 1557 stands in direct conflict with both

the statute's plain terms and the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490

U.S. 228 (1989). Second, the district court's RFRA analysis did not adequately consider the

government's compelling interest in enforcing anti-discrimination laws and failed to tailor RFRA

relief to the religious burdens asserted by Private Plaintiffs. At the very least, Proposed

Intervenors have presented a substantial case on the merits of these serious legal questions.

### A.     The Final Rule Does Not Violate the Administrative Procedure Act.

The district court held that the Final Rule violates the APA in two respects. First, the

court held that the Final Rule's gender identity provision unreasonably construed Section 1557's

sex discrimination prohibition to encompass discrimination against transgender individuals.

Second, the court held that the Final Rule unreasonably failed to incorporate Title IX's "entire

statutory structure," including its religious exemption and abortion language, into Section 1557.

### 1.     The Final Rule Reasonably Construed Section 1557 to Prohibit Discrimination Based on Gender Identity.

The district court reasoned that the Final Rule's gender identity provision is not entitled

to *Chevron* deference because Title IX, as incorporated into Section 1557, was clearly "intended

to prohibit sex discrimination on the basis of the biological differences between males and

females." Dkt. No. 62 at 32. At a minimum, the district court's analysis stands in direct conflict

with *Price Waterhouse*. There, the Supreme Court made clear that discrimination on the basis of

sex encompasses more than just discrimination based on biological differences between the

sexes. 490 U.S. at 242; *accord EEOC v. Boh Bros. Const. Co.*, 731 F.3d 444, 454 (5th Cir. 2013)

(en banc). Applying *Price Waterhouse*, a number of appellate and district courts throughout the

country have held that discrimination based on gender identity is discrimination "because of

sex," including in the Section 1557 context. *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566, 573–75 (6th Cir. 2004); *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000); *Baker v. Aetna Life Ins. Co.*, No. 3:15-CV-3679-D, 2017 WL 131658, at *5 (N.D. Tex. Jan. 13, 2017); *Roberts v. Clark Cty. Sch. Dist.,* No. 2:15-CV-00388-JAD-PAL, 2016 WL 5843046, at *9 (D. Nev. Oct. 4, 2016); *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016); *Dawson v. H&H Elec., Inc.*, NO. 4:14CV00583 SWW, 2015 WL 5437101, at *3 (E.D. Ark. Sept. 15, 2015); *Rumble v. Fairview Health Servs.*, No. 14-cv-2037 (SRN/FLN), 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015); *Finkle v. Howard Cty., Md.*, 12 F. Supp. 3d 780, 788 (D. Md. 2014); *Schroer v. Billington*, 577 F. Supp. 2d 293, 305 (D.D.C. 2008). This Court cited approvingly to several of these decisions in *Boh Brothers*. 731 F.3d at 454 n.4.

The district court declined to apply *Price Waterhouse* to its analysis of Section 1557 because "*Price Waterhouse* dealt with the definition of 'sex' in the Title VII context, not the incorporated statute at issue here: Title IX." Dkt. No. 62 at 35 n.28. But the meaning of "sex" under Title IX is the same as the meaning of "sex" under Title VII. *See, e.g.*, *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 75 (1992) (referencing a Title VII case for the proposition that Title IX "[u]nquestionably" prohibits sexual harassment) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).[2] And "courts have looked to Title VII as an analog for the legal standards in both Title IX discrimination and retaliation claims." *Nelson v. Christian Bros. Univ.*, 226 Fed. App'x 448, 454 (6th Cir. 2007) (collecting cases).

---

[2] The district court disputes whether *Gwinnett* supports this proposition. *See* Dkt. No. 69 at 10 n.7 (stating that *Gwinnett* "decline[d] to reach 'whether Title VII analysis should apply to an action under Titles VI or IX'" (quoting *Gwinnett*, 503 U.S. at 65 nn.4–5)). But the portion of *Gwinnett* cited by the district court refers to the remedies available under Title VII and Title IX, respectively—not to the meaning of sex discrimination under those statutes.

The district court's reasoning would preclude *any* form of sex stereotyping claim under Section 1557, not just claims involving discrimination based on gender identity. For example, Ann Hopkins—the plaintiff in *Price Waterhouse*— could be refused treatment at a hospital because she did not look feminine enough. *See* 490 U.S. at 235, 250–51. The district court provided no reason why the definition of "sex" under Title IX and Section 1557 should be narrower than the definition of "sex" under Title VII, even though it produces such anomalous results.

### 2.    The Final Rule Reasonably Construed Section 1557 as Not Incorporating Title IX's Religious Exemption and Abortion Language.

The district court also erred in concluding that the Final Rule is arbitrary, capricious, and contrary to law under the APA because it does not incorporate Title IX's abortion language and religious exemption. Dkt. No. 62 at 35–38 (citing 20 U.S.C. §§ 1681(a)(3), 1688)). Observing that Section 1557 prohibits discrimination "on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794)," the district court reasoned that the inclusion of the phrase "et seq." following the citation to Title IX "can only mean Congress intended to incorporate the entire statutory structure, including the abortion and religious exemptions." Dkt. No. 62 at 37 (42 U.S.C. § 18116(a)). This analysis suffers from at least two flaws.

First, the district court's interpretation of Section 1557's plain terms reads out the most critical phrase in Section 1557's statutory text: "on the ground prohibited." That language explicitly tracks the phrasing in Title VI, which states that "[n]o person in the United States shall,

*on the ground of* race, color, or national origin . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (emphasis added). "The language of Title IX, 'on the basis of sex,' is materially the same as Title VI, 'on the ground of race.'" *Pruitt v. Anderson*, Civil No. 11-2143 (DSD/JJK), 2012 WL 104540, at *2 n.4 (Jan. 12, 2012); *accord, e.g.*, *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014); *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 346 (11th Cir. 2012). Thus, Section 1557's reference to the "ground prohibited" expressly refers to the characteristics (race, sex, ethnicity, national origin, age, and disability) protected under the various civil rights laws, not to the "entire statutory structure[s]" of those laws. Other elements of Section 1557 reinforce this reading. For instance, Section 1557 states that "[t]he enforcement mechanisms provided for and available under such title VI, title IX, section 504, or such Age Discrimination Act shall apply for purposes of violations of this subsection." 42 U.S.C. § 18116(a). Such language would have been superfluous if Section 1557 incorporated those laws' entire statutory structures.

Second, the district court erred in suggesting that the Final Rule's prohibition against discrimination "on the basis of . . . termination of pregnancy," 45 C.F.R. §92.4, conflicts with Title IX's abortion provision. To the contrary, Title IX's abortion provision states in relevant part that "[n]othing in this section"—including the religious exemption and abortion language— "shall be construed to permit a penalty to be imposed on any person or individual because such a person or individual is seeking or has received any benefit or service related to a legal abortion." 20 U.S.C. § 1688. Similarly, Title IX's implementing regulations expressly prohibit discrimination based on "termination of pregnancy." *See, e.g.*, 45 C.F.R. § 86.40(b). The Final Rule's termination of pregnancy provision simply restates these requirements. By facially enjoining this provision, the district court arguably restrained Defendants from taking action

against covered healthcare entities that refuse to provide healthcare services or coverage to a patient *because* the patient has sought or obtained an abortion. These sorts of practices plainly discriminate based on sex. *See Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996).

### B.  The Final Rule Does Not Violate RFRA.

The district court also erred in its assessment of Plaintiffs' RFRA claims. Assuming, *arguendo*, that the Final Rule advances a compelling government interest, the court held that the government has "numerous less restrictive means available to provide access and coverage for transition and abortion procedures." Dkt. No. 62 at 42. But it is not a less restrictive alternative, as the court suggested, for the government to create a whole new program to "assist transgender individuals in finding and paying for transition procedures available from the growing number of healthcare providers who offer and specialize in those services." Dkt. No. 62 at 41–42. Even if the government could devise such a program, it would be unable to ensure the availability of willing and accessible providers to whom patients may be referred. This could prove particularly devastating for people living in rural areas or in cases where a person's health is already severely compromised. *See* 81 Fed. Reg. at 31,380.

Practical concerns aside, such alternatives fail to address the government's compelling interest in ensuring that people are able to access healthcare on a non-discriminatory basis. The turning away of someone because of who they are is exactly the harm both Section 1557 and the Final Rule are meant to address—a harm not solved simply by finding another provider. For example, a government program to find new jobs for victims of employment discrimination is not a less restrictive alternative to enforcement of employment discrimination laws. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2783 (2014). Every single instance of discrimination "causes grave harm to its victims." *United States v. Burke*, 504 U.S. 229, 238

(1992). That is especially true in the healthcare context, where a discriminatory denial of coverage or services may discourage, or even prevent, individuals from seeking medically necessary care. *See* 81 Fed. Reg. at 31,380.

Finally, a court applying RFRA must carefully tailor judicial relief to the asserted burden on the claimant's religious exercise. RFRA does not "require[] (or permit[]) courts to nullify whole regulations just because they have a potential for improper application to a particular faith or belief." *Borzych v. Frank*, 439 F.3d 388, 391 (7th Cir. 2006). Rather, it requires "case-by-case consideration of religious exemptions to generally applicable rules." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006); *accord Adkins v. Kaspar*, 393 F.3d 559, 571 (5th Cir. 2004). Here, there is no indication that the district court properly tailored its RFRA analysis. The preliminary injunction facially restrains Defendants from enforcing the Final Rule's gender identity and termination of pregnancy provisions with respect to all covered healthcare entities throughout the country. But it is far from clear that Plaintiff CMDA is entitled to RFRA relief even with respect to all of its *members*, given that only one member has submitted a declaration asserting that the Final Rule substantially burdens his religious exercise.[3] Moreover, regardless of whether Plaintiffs have adequately supported their contention that the Final Rule's text related to the provision of transition-related care and reproductive care substantially burdens their religious exercise in violation of RFRA, that *still* would not entitle them to an injunction against the Final Rule's provisions prohibiting other forms of discrimination based on gender identity or termination of pregnancy—such as the denial of routine care.

---

[3] Indeed, it is not even clear that the member CMDA has identified is a covered healthcare entity subject to the Final Rule. Proposed Intervenors pointed out this deficiency in their stay briefing, *see* Dkt. No. 53 at 9 n.5, but it was not addressed by the parties or the district court.

## II.     Proposed Intervenors' Members and the Public Will Be Irreparably Harmed If a Stay Is Not Granted.

The balance of the harms and the public interest weigh heavily in favor of staying the nationwide preliminary injunction. In granting the injunction, the district court stated summarily that "HHS will suffer no harm from delaying implementation of the challenged portion of the Final Rule." Dkt. No. 62 at 44. The court failed to consider the serious injury the injunction imposes on Proposed Intervenors' members, as well as thousands of other transgender people and women seeking reproductive care throughout the country. "[M]any women and transgender individuals continue to experience discrimination in the healthcare context, which can lead to denials of adequate health care and increases in existing health disparities in underserved communities." 81 Fed. Reg. at 31,460. The nationwide preliminary injunction prevents Defendants from investigating and enforcing Section 1557 with respect to any instance of discrimination, in healthcare services or coverage, against transgender people or against patients who seek or who have obtained certain forms of reproductive healthcare.

Already, the injunction's effects are reverberating throughout the country. On January 30, a federal court suggested that the injunction might apply to a Section 1557 claim filed by a transgender teenager—who was subject to six days of physical and verbal abuse at a Minnesota hospital while seeking treatment for a fever and excruciating pain—even though the court had previously determined that Section 1557 applies to discrimination based on gender identity. *Rumble v. Fairview Health Services*, Civil No. 14-CV-2037 (SRN/FLN), 2017 WL 401940 (D. Minn. Jan. 30, 2017); *see also Rumble*, 2015 WL 1197415, at *2 (describing the abuse).[4] And,

---

[4] The court ultimately did not resolve whether the preliminary injunction applied, because it decided to stay the case pending the Supreme Court's resolution of *Gloucester County School Board v. G.G. Rumble*, 2017 WL 401940, at *4.

according to recent reports, the University of Arkansas's employee benefits director has

informed the University's employees that, given the nationwide preliminary injunction, "the

University will suspend gender dysphoria coverage pending the final legal outcome of the

injunction or further clarification of the ACA coverage guidelines." Carla Lewis, *University of*

*Arkansas Abruptly Removes Transgender Health Benefits*, Manicsquirrel (January 26, 2017).[5]

Other stories of discrimination demonstrate the need for the Final Rule, and the harm

imposed by the injunction. One transgender patient reported having "been denied care by doctors

and major hospitals so much," that the patient "now use[s] only urgent care physician assistants,

and [] never reveal[s] [] gender history." Jaime M. Grant et al., National Center for Transgender

Equality and National Gay and Lesbian Task Force, *Injustice at Every Turn: A Report of the*

*National Transgender Discrimination Survey* 6, 75 (2011) ("Grant Report"). Another

transgender person reported having been "refused emergency room treatment even when

delivered to the hospital by ambulance with numerous broken bones and wounds." *Id.* at 73.

These stories are not unusual. Seventy percent of transgender and gender-nonconforming

survey respondents report experiencing discrimination in healthcare, including: refusals of

needed care; healthcare professionals refusing to touch them or using excessive precautions;

healthcare professionals using harsh or abusive language; being blamed for their health status; or

healthcare professionals being physically rough or abusive. *See* Lambda Legal, *When Health*

*Care Isn't Caring: Lambda Legal's Survey of Discrimination Against LGBT People and People*

*with HIV* 5 (New York: Lambda Legal, 2010). Approximately one-third of transgender survey

respondents report that they have delayed or avoided preventative healthcare, or postponed

medical treatment when sick or injured, due to fear of discrimination. Grant Report at 76; *see*

---

[5] http://manicsquirrel.com/2017/01/26/uofa-removes-transgender-care/.

*also* The American College of Obstetricians and Gynecologists Committee on Health Care for Underserved Women, *Health Care for Transgender Individuals Committee Opinion* 1, 3 (2011).

Patients seeking reproductive care are also in danger. Catholic healthcare systems around the country prohibit a range of reproductive health services and information, including services and information related sterilization and abortion, even when a person's health or life is at risk. For example, Tamesha Means rushed to a Catholic hospital in Michigan when her water broke after only 18 weeks of pregnancy. *Means v. U.S. Conference of Catholic Bishops*, 836 F.3d 643, 646 (6th Cir. 2016). She was in excruciating pain, there was virtually no chance that the pregnancy would make it to term, and continuing the pregnancy posed significant risks to her health. *Id.* at 646–67. But the hospital, which followed the Ethical & Religious Directives for Catholic Health Care Services, sent Tamesha home twice—telling her that there was nothing they could do, and declining to inform her that terminating her pregnancy was an option and the safest course for her condition. *Id.* While the hospital was preparing to send Tamesha home a third time, she began to deliver. *Id.* She gave birth to a very premature son, who died within hours. Her hospital records showed acute bacterial infections at the time she gave birth. *Id.*

Preserving the government's ability to enforce the Final Rule is essential to the proper implementation of Section 1557. Although private litigants may still act to protect their rights under Section 1557 and the Final Rule, the federal government's "interests in determining the legality of specific conduct and in deterring future violations are distinct from [a private plaintiff's] interest in a personal remedy." *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1542 (9th Cir.1987). These different aims may well impact the framing of the case and relief sought—for example, the government is more likely to seek injunctive relief in order to prevent further and future harm to all members of a protected class. Moreover, the government plays a

vital role in pursuing claims private parties may not be able to finance, particularly where potential damages available are minimal, and in monitoring compliance.

### III.    A Stay Would Not Irreparably Harm Plaintiffs.

By contrast, a stay of the preliminary injunction would not irreparably harm Plaintiffs. Although Plaintiffs claim that any enforcement of the Final Rule threatens irreparable injury, these concerns are easily addressed: Should Defendants initiate enforcement proceedings, Plaintiffs would be entitled to extensive pre-enforcement administrative and judicial process before any penalty would issue. If proceedings against any Plaintiff become imminent, the Court could lift the stay with respect to that party upon application. Although Plaintiffs point to several lawsuits as evidence that other entities with insurance plans similar to their own have already been sued for violating the Final Rule, Dkt. No. 25 at 25, these lawsuits were filed by private plaintiffs—who are not bound by the injunction.[6]

The district court also concluded that the Final Rule imposes irreparable harm on the State Plaintiffs by preventing them from enforcing statutes "mandat[ing] [that] a physician's independent medical judgment be given paramount consideration when providing treatment because the Rule makes a physician's independent medical judgment one of many factors in evaluating compliance." Dkt. No. 62 at 42–43. But the Texas state law to which the district court referred states that "[a] health organization certified under Section 162.001(b) may not interfere with, control, or otherwise direct a physician's professional judgment in violation of this subchapter or any other provision of law, including board rules." Tex. Occ. Code § 162.0021. There is no indication that this statute, which applies to healthcare organizations, was meant to prevent the federal government from enforcing civil rights laws. Moreover, the Final Rule

---

[6] If the injunction did bind private parties, however, that would make a stay all the more imperative.

applies to covered healthcare entities—i.e., healthcare entities receiving federal healthcare funding from HHS—and does not require individual physicians or other employees at covered entities to perform any particular healthcare procedures. 81 Fed. Reg. at 31,384. Nor does the Final Rule require physicians to provide medical care that is not in accordance with their medical judgment. *See* 81 Fed. Reg. at 31,405.

**IV.    Even if the Court Determines That a Stay Is Not Merited, It Should Limit the Scope of the Injunction.**

Even if this Court concludes that a general stay of the preliminary injunction is not merited, it should at least limit the injunction to the specific harms alleged by Plaintiffs. In particular, the district court's facial injunction against the Final Rule's gender identity and termination of pregnancy provisions goes well beyond Plaintiffs' objection to providing gender-affirming and abortion-related care. The district court summarily concluded that denying this medically necessary care is not discrimination on the basis of sex. Proposed Intervenors strongly disagree. But even if the district court's legal conclusion were correct, that still would not justify its decision to issue a preliminary injunction that restrains Defendants from enforcing the Final Rule's gender identity and termination of pregnancy provisions *in their entirety*. That sort of preliminary relief, which goes well beyond Plaintiffs' alleged harms, is plainly not justified.

First, with respect to the Final Rule's gender identity provision, the only injuries claimed by Plaintiffs relate to the coverage or provision of transition-related healthcare. *See* Dkt. No. 21 ¶¶ 58, 60, 62, 64, 78, 98, 101, 107. The preliminary injunction, however, restrains Defendants from taking any action to enforce Section 1557 against any covered healthcare entity in the country that refuses to provide routine medical care to a transgender person because of how they walk, talk, dress, or look. In its order denying a stay, the district court stated that the nationwide preliminary injunction does "not purport to alter any statutory duties outside the challenged

portion of the Rule at issue that may compel a governmental agency to investigate or prosecute instances of harassment or discrimination." Dkt. No. 69 at 10. But the court did not address the fact that its injunction restrains Defendants from enforcing the Final Rule to prohibit harassment or discrimination against transgender people based on their non-conformance with sex stereotypes, nor did the district court identify any other authorities that Defendants might invoke in lieu of the Final Rule to prevent or deter such harassment. *See Rumble*, 2017 WL 401940, at *2–*4 (suggesting that the preliminary injunction applies to a Section 1557 claim brought by a transgender teenager who was subject to verbal and physical abuse based on his gender identity while receiving medical care for a fever and excruciating pain).

Second, with respect to reproductive care, the only injuries claimed by Plaintiffs relate to the coverage or provision of certain forms of reproductive care. *See* Dkt. No. 21 ¶¶ 65, 66, 83, 103, 107.  But, as discussed above, the preliminary injunction ostensibly restrains Defendants from enforcing Section 1557 against any covered healthcare entity in the country that refuses to provide routine medical care to a woman because she has obtained an abortion.  In its order denying a stay, the district court stated that the injunction "does not permit a healthcare provider to refuse routine healthcare to a woman because she previously had an abortion," and agreed that such practices are "plainly sex discriminatory." Dkt. No. 69 at 9 (citation and internal quotation marks omitted). Yet the court has not lifted the facial injunction against the Final Rule's termination of pregnancy provision, which prohibits such discrimination.

Thus, at the very least, this Court should issue a stay limiting the preliminary injunction to the specific harms alleged by Plaintiffs.

## CONCLUSION

In light of the foregoing considerations, the Court should stay the preliminary injunction pending appeal. Alternatively, the Court should issue a stay limiting the preliminary injunction to the specific harms alleged by Plaintiffs.

Respectfully submitted this 10th day of February, 2017.

Rebecca L. Robertson
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
(713) 942-8146

Kali Cohn
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS
P.O. Box 600169
Dallas, TX 75360
(214) 346-6577

Daniel Mach
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street, N.W.
Washington, D.C. 20005
(202) 548-6604

/s/Brigitte Amiri
Brigitte Amiri
Brian Hauss
Joshua Block
James D. Esseks
Louise Melling
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

Amy Miller
AMERICAN CIVIL LIBERTIES
UNION OF NEBRASKA
134 S. 13th St., #1010
Lincoln, NE 68508
(402) 476-8091

*Counsel for Proposed Intervenors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 10, 2017, I electronically filed the foregoing motion with the Clerk of the Court by using the appellate CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<u>/s/Brigitte Amiri</u>
Brigitte Amiri

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 5th Cir. Rules 27.4 and 28.2.1, I hereby certify as follows:

**(1)** This case is *Franciscan Alliance, INC., et al., v. Cochran, et al.*, No. 17-10135

(5th Cir.).

**(2)** The undersigned counsel of record hereby certifies that the following

persons and entities, including those described in the fourth sentence of Rule

28.2.1, have an interest in the outcome of this case:


Proposed Intervenors-Appellants:

> American Civil Liberties Union of Texas
> River City Gender Alliance

Defendants-Appellees:

> Norris Cochran, in her official capacity as Acting Secretary of the U.S. Department of Health and Human Services
> U.S. Department of Health and Human Services

Plaintiffs-Appellees:

> Franciscan Alliance, Inc.
> Christian Medical and Dental Associations
> Specialty Physicians of Illinois, LLC
> State of Texas
> State of Wisconsin
> State of Nebraska
> Commonwealth of Kentucky, by and through Governor Matthew G. Bevin
> State of Kansas
> State of Louisiana
> State of Arizona
> State of Mississippi, by and through Governor Phil Bryant

Counsel:

For Proposed Intervenors-Appellants:

> Brigitte Amiri, American Civil Liberties Union Foundation
> Brian Hauss, American Civil Liberties Union Foundation

Joshua Block, American Civil Liberties Union Foundation
James Esseks, American Civil Liberties Union Foundation
Louise Melling, American Civil Liberties Union Foundation
Daniel Mach, American Civil Liberties Union Foundation
Rebecca Robertson, American Civil Liberties Union of Texas
Kali Cohn, American Civil Liberties Union of Texas
Amy Miller, American Civil Liberties Union of Nebraska

For Defendants-Appellees:

Adam Anderson Gross, U.S. Department of Justice
Bailey Wilson Heaps, U.S. Department of Justice
Emily Brooke Nestler, U.S. Department of Justice

For Plaintiffs-Appellees:

Luke Goodrich, The Becket Fund for Religious Liberty
Mark Leonard Rienzi, The Becket Fund for Religious Liberty
Austin R. Nimocks, Office of the Attorney General of Texas

/s/Brigitte Amiri
Brigitte Amiri